UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ROBERT A. KRIEG and ) | |
| AMERICAN FEDERATION OF STATE, ) | |
| COUNTY and MUNICIPAL EMPLOYEES, ) | |
| LOCAL NO. 3063, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Cause No: 1:04CV0430 |
| -vs- ) | |
| WAYNE SEYBOLD, in his official capacity ) | |
| as Mayor of the City of Marion, ) | |
| JACK ANTROBUS, in his individual and ) | |
| official capacities as Superintendent of the City ) | |
| of Marion Street and Sanitation Department, ) | |
| and CITY OF MARION, INDIANA, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On November 17, 2004, Robert Krieg ("Krieg") and the American Federation of State,

County and Municipal Employees, Local No. 3063 ("the Union"), filed a  Complaint against the

defendants raising Fourth and Fourteenth Amendment claims arising out of a random drug test

administered to employees of the City of Marion Street and Sanitation Department on October

28, 2004.  Krieg himself refused to submit to the random drug test, but other employees were

tested.   Krieg and the Union allege that the random drug test was an unreasonable search and

seizure in violation of the Fourth Amendment.    The Union asserts that the City of Marion's

June 7, 2004 Substance Abuse Policy is unconstitutional on its face and as applied to Krieg and

all Union members.    Krieg also alleges that after he refused to submit to the random drug test,

the defendants discharged him from his employment with the City of Marion without a pre-

termination hearing, in violation of his due process rights under the Fourteenth Amendment. Finally, Krieg asserts a state law defamation claim arising from comments allegedly made about him by the defendant, Jack Antrobus, Superintendent of the City of Marion Street and Sanitation Department. ("Superintendent Antrobus"). [1]

## II. <u>STATEMENT OF FACTS</u>

Krieg was hired as a driver/laborer for the City of Marion Street and Sanitation Department when he graduated from high school in 1986. (Dep. of Krieg at p. 13). Krieg does not possess a commercial driver's license ("CDL"). (Dep. of Krieg at p. 18). It is his understanding that as he was hired by the City of Marion prior to September 2000, he was not required to obtain a CDL as a condition of continued employment. (Dep. of Krieg at pp. 78-79). According to Superintendent Antrobus several years ago, the City of Marion enacted a policy requiring all new Street Department hires to obtain a CDL within six months of hire. However, Krieg and several other employees were grandfathered in and therefore were not required to obtain a CDL as a condition of continued employment. When Antrobus became the Superintendent in January 2000, there were approximately forty (40) employees in the Street and Sanitation Department and approximately eight (8) employees did not possess CDLs. (Dep. of Antrobus at pp. 14-15). As of October, 2004, approximately six (6) employees did not possess CDLs. (Dep. of Antrobus at p. 16).

Although he did not possess a CDL, Krieg admits that he regularly operated a one-ton truck as well as a pick-up truck as part of his employment. He also regularly operated a backhoe and a front-end loader. (Dep. of Krieg at pp. 16-19). According to Superintendent Antrobus, on

---

[1] George Gonzales was dismissed as a plaintiff on March 3, 2005 and the claims raised in Count III of the Complaint were also dismissed on that day. In addition, while the Complaint alleges that the defendants engaged in a warrantless search of Krieg and Gonzales's lockers on October 28, 2004 (Complaint at ¶14), Krieg has apparently abandoned the search claim as he admitted in response to discovery that he has "no evidence to cause him to continue to believe that the locker search was conducted without a warrant having being previously issued."

any given day, Krieg might be asked to operate a one-ton dump truck, a pick-up truck, a bucket truck, a backhoe, or a loader. (Dep. of Antrobus at pp. 21-23). Krieg also might be asked to mow grass for which he would use a large John Deere tractor, probably 50 horsepower, with a bush hog on the back. (Dep. of Antrobus at p. 25). According to Superintendent Antrobus, on an average day, Krieg spent approximately six (6) hours working out in the City of Marion. (Dep. of Antrobus at p. 24). Krieg's job required him to patch roads, plow snow, mow grass, drive a dump truck to transport sand and gravel, and operate the backhoe to pick up tree limbs. (Dep. of Krieg at p. 17).

Krieg concedes that he operated heavy equipment in areas where the general public might be in a vehicle, or as a pedestrian, particularly if he was working in downtown Marion. (Dep. of Krieg at pp.19-20). Krieg agrees that unsafe operation of a pick-up truck, dump truck, or other equipment owned by the City of Marion could cause injury to himself, co-workers, and the general public. (Dep. of Krieg at p. 47). Krieg hypothetically agrees that if he was under the influence of alcohol or drugs while operating trucks and other equipment for the City of Marion, it could create a safety hazard. (Dep. of Krieg at p. 91). Stephen Johnson ("Johnson"), another Street and Sanitation Department employee and President of the Union, agrees that if Krieg operated heavy machinery and vehicles while under the influence of alcohol and drugs, he could be a safety hazard. (Dep. of Johnson at p. 17).

Because all Street and Sanitation Department employees operate trucks and machinery regardless of whether they possess a CDL, Superintendent Antrobus is of the opinion that all of his employees hold safety sensitive positions. (Dep. of Antrobus at p. 13). While Krieg claims that no one ever told him his position was a safety sensitive position, he agrees that no one have ever told him his position was not a safety sensitive position. (Dep. of Krieg at pp. 40, 44).

Krieg, like other employees of the Street and Sanitation Department, is a member of the Union. On October 28, 2002, the Union and the City of Marion entered into a Collective Bargaining Agreement ("the 2003-2004 CBA") for 2003 and 2004. Exhibit A. In Article XXI of the 2003-2004 CBA, the Union agreed to comply with the City of Marion's drug and alcohol policy.[2]

### ARTICLE XXI – POLICY ON ALCOHOL AND ILLEGAL DRUGS

SECTION 1. **All Street and Sanitation workers shall comply with the CITY'S Drug and Alcohol Policy.**

SECTION 2. **Drug/Alcohol Testing may be conducted on Street and Sanitation workers post-accident, upon reasonable suspicion or randomly as per the current City policy.** A minimum of 50% of the employees shall be tested at least once a year.

\*          \*          \*          \*

SECTION 5. …**Refusal to submit to the testing provided under this agreement shall be grounds for discipline up to and including termination**. (Emphasis added).

The City of Marion Personnel Policies Handbook in effect as of October, 2002, when the 2003-2004 CBA was signed includes a drug testing policy which provided that any department head could require an employee to submit to drug testing when there was a reasonable suspicion that the employee was under the influence of drugs or alcohol, or after a City employee was involved in an accident.[3] Exhibit C. In addition, the Handbook provided for random drug testing of all "safety-sensitive employees," and included within that definition "**all positions which require an employee to operate a commercial vehicle and/or hold a commercial driver's license**."

---

[2] It is noteworthy that the 2005 CBA contains the identical language whereby the Union agrees to comply with the City of Marion's drug and alcohol policy. Exhibit B, Article XXI. That the language remained the same is interesting given the fact that the 2005 CBA was signed in February, 2005 months after the present lawsuit was filed challenging the City of Marion's drug testing policy.

[3] The Personnel Policies Handbook has an effective date of June 1, 2001.

Throughout the course of his employment with the City of Marion, Krieg was subjected to a number of random drug tests. (Dep. of Krieg at pp. 32-33). Street and Sanitation Department employees were subjected a random drug test twice a year and sometimes Krieg was chosen for testing and other times he was not. (Dep. at Krieg at p.p. 38-39). Whenever he was selected, Krieg submitted to the test. (Dep. of Krieg at p. 38). Johnson agrees that when the 2003-2004 CBA was signed, all Street Department employees could be randomly drug tested, regardless of whether or not the employee possessed a CDL. (Dep. of Johnson at pp. 6-7). William Clouse ("Clouse"), staff representative and advisor for AFSCME Counsel 62, agrees that the 2003-2004 CBA contains a random drug testing provision. (Dep. of Clouse at p. 13).

Krieg was given a random drug test in December, 2002 and the results came back with a positive finding for marijuana. (Dep. of Krieg at p. 30). Krieg was suspended and required to undergo drug counseling as a result of the positive drug test. He challenged these actions by filing a grievance, which was supported by the union. (Dep. of Krieg at p. 31).

On December 30, 2003, criminal charges were filed against Krieg in State of Indiana v. Robert Krieg, Jr., Marion City Court, Cause No. 27H02-0312-CM-1391 for intimidation-fear of retaliation, a Class A misdemeanor. The criminal information states that on or about December 20, 2003, Krieg "did communicate a threat to Josh Sutton, with the intent that Josh Sutton be placed in fear of retaliation for a prior lawful act, to-wit: videotaping him during a child custody exchange." On August 26, 2004, Krieg was tried in the Marion City Court on the intimidation charge and was found guilty. The chronological summary indicates that Krieg's sentence was 180 days in jail, which was suspended, along with one year probation, which would be until August 26, 2005. Exhibit J. Krieg concedes that terms of his probation included no use of alcohol and drugs and that if he violated his probation he would have to return to Court, and

probably go to jail. (Dep. of Krieg at p. 28).

On June 7, 2004, the City of Marion adopted a new Personnel Policy and Procedure Manual ("the 2004 Manual"). Exhibit D. The Personnel Policy and Procedure Manual became effective June 7, 2004 and contains a Substance Abuse Policy which appears in Section 7.05. With respect to random drug testing, the 2004 Manual reads as follows:

> Employees in safety-sensitive positions as defined by 49 C.F.R. 382, as well as any other City employee, will be subjected to random, unannounced testing.

The 2004 Manual defines a safety sensitive position as follows: a safety sensitive function is any duty related to the safe operation of City equipment during any period in which the City employee is actually performing, ready to perform, or immediately available to perform any safety sensitive functions.

When the City of Marion promulgated the new Manual, the Union, through Johnson, filed a grievance on behalf of the union complaining that it had not been negotiated with the Union. Johnson and other Union members refused to sign the original acknowledgement for receipt of the new handbook. (Dep. of Johnson at pp. 8, 10). Eventually, the City of Marion and the Union came up with a solution whereby the Union employees had to sign a form indicating that they received the handbook, but there was nothing on the form stating that the Union employees agreed to anything in the handbook merely by receipt of the handbook. (Dep. of Johnson at p. 11).

On October 28, 2004, at approximately 7:00 a.m., Superintendent Antrobus informed all employees of the Street and Sanitation Department that he had ordered a 100% employee drug screen to be administered that day and that employees could not leave the building until they had been tested. (Dep. of Antrobus at p. 39, 48 Dep. of Krieg at p. 34). In response to being informed about the drug test, Krieg told Superintendent Antrobus, "Jack, I ain't going to take the

6

test." (Dep. of Krieg at p. 35). Johnson heard Krieg refuse to take the test. (Dep. of Johnson at p. 12). Krieg did not give Superintendent Antrobus an explanation as to why he was not going to take the test. (Dep. of Krieg at p. 37).[4]

In response to Krieg's refusal to take the drug test, Antrobus again requested that Krieg submit to the test. (Dep. of Antrobus at p. 44). Krieg again stated that he would not take the test. (Dep. of Krieg at p. 37). Superintendent Antrobus cautioned Krieg that he could be terminated if he refused to take the test and Krieg indicated that he understood, but was still refusing to take the test. (Dep. of Krieg at p. 37; Dep. of Antrobus at p. 49).

As Krieg refused to take the drug test, Superintendent Antrobus told him he was no longer employed and told Krieg to leave the building. (Dep. of Krieg at p. 37; Dep. of Antrobus at p. 49). The Union President, Johnson, concedes that Krieg was being insubordinate by refusing to take the drug test when ordered to do so. (Dep. of Johnson at p. 13). As Union President, Johnson's normal recommendation to an employee would be to follow the order and then file a grievance later. (Dep. of Johnson at p. 13).

Krieg refused to leave the building upon Superintendent Antrobus' orders. Rather than leave the building, Krieg used the telephone in the building to place a call to his attorney. (Dep. of Krieg at p. 37). Superintendent Antrobus again ordered Krieg out of the building but he once again refused. When Krieg refused to comply, Superintendent Antrobus called the police. (Dep. of Krieg at pp. 41-42; Dep. of Antrobus at p. 50).

As soon as Superintendent Antrobus called the police, Krieg walked out of the building and went out to his car until the police arrived. (Dep. of Antrobus at p. 50). Krieg asked Superintendent Antrobus if he was fired. In response, Superintendent Antrobus said, "[B]ob, I have to take you to the Board of Works, you refused a drug screen." While Antrobus may have

---

[4] Krieg was still on probation as of October 28, 2004. (Dep. of Krieg at p. 27).

used the words fired or terminated, he also told Krieg, "I have to take you to the Board of Works, they will make the decision." (Dep. of Antrobus at pp. 50-51). When the police arrived and told Krieg to leave the building, he voluntarily complied. (Dep. of Krieg at p. 43).

Superintendent Antrobus completed an Employee Disciplinary Report concerning Krieg's refusal to submit to the drug screen. Exhibit E. Superintendent Antrobus also prepared a typewritten statement concerning the incident. Exhibit F. Among other things, Superintendent Antrobus wrote, "he also asked if he was fired and I told him that I would notify him and he would be subject to a Board of Works hearing."

The 2003-2004 CBA contains a four-step grievance procedure which is set forth in Article V. Exhibit A. Step 1 of the grievance procedure requires the aggrieved employee to discuss his or her complaint with his or her immediate supervisor within 40 working hours of the occurrence. Any denial by the supervisor shall be given to the employee in writing within 40 working hours. The employee has the right to be represented by a Union steward.

Step 2 of the grievance procedure provides that if a grievance is not settled satisfactorily in Step 1, the grievance shall be submitted in writing within three working days to the superintendent of the department who shall then submit a written answer within three working days after any meeting. On October 29, 2004, Steve Johnson, the Union steward, submitted an official grievance on behalf of Krieg. Exhibit G. The grievance is stated as "disparaging treatment of Robert Krieg and any and all applicable violations of the contract." The relief requested was "reinstatement and make employee whole." Superintendent Antrobus disposed of the grievance by writing "refused" on the grievance form.

Step 3 of the grievance procedure provides that if the grievance is not settled in Step 2, the grievance shall be submitted by the Union President and the aggrieved employee to the

Board of Public Works and Safety. The Board of Public Works and Safety shall make a ruling within 20 working days. Step 3 provides that if either side is dissatisfied with the decision of the Board of Public Works, a request to go to Step 4 of the grievance process shall be made within 15 working days.

On November 1, 2004, Darren Reese, the Human Resources Director for the City of Marion, sent Krieg a letter stating that because Krieg refused to submit to the mandatory drug screen, as provided in the Union contract, Human Resources Director Reese intended to recommend Krieg's termination to the Board of Public Works at its November 15, 2004 meeting. Exhibit H. The November 1, 2004 letter to Krieg reads as follows:

> This letter is to document your refusal to participate in a mandatory drug screen, as prescribed by contract, on the morning of October 28, 2004. As clearly stated in your contract, Article XXI, section 5, final sentence, "Refusal to submit to the testing provided under this agreement shall be grounds for discipline up to and including termination." Also, as stated in section 7 of the same Article "Refusal to participate or re-occurrence of positive testing results will result in immediate termination of employment."

> It is the intent of the City of Marion to recommend to the Board of Public Works and Safety at their next meeting (Nov. 15, 2004 at 10:00 a.m.) that your employment be terminated. Until the Board of Works makes it decision, you will remain suspended without pay.

The Board of Public Works held its regularly scheduled meeting on November 15, 2004. Exhibit I. The minutes indicate Superintendent Antrobus attended the meeting along with Clouse and Johnson. Krieg did not appear for the Board of Works hearing. After considering all of the statements made by the various parties, the Board of Public Works decided to terminate Krieg's employment.

Krieg concedes that he received notice of the Board of Works meeting and that he was provided with an opportunity to attend the meeting. (Dep. of Krieg at pp. 54-55). Krieg also concedes that he had an opportunity to present evidence at the Board of Works meeting and be

represented by an attorney or a union representative. (Dep. of Krieg at p. 55). Upon the advice of his counsel, Krieg did not attend the meeting. (Dep. of Krieg at p. 55). Krieg agrees that no one from the City of Marion told him that he could not attend the meeting. (Dep. of Krieg at p. 56).

Krieg testified that the only reason he refused to undertake the drug test was because he did not think he should have to do so because he did not possess a CDL and therefore it was illegal for him to be required to submit the drug testing. (Dep. of Krieg at p. 92). Krieg acknowledges that he was jeopardizing his employment by not submitting to the test and that there was a chance he would be fired for not submitting to the test. (Dep. of Krieg at p. 92).

Johnson concedes that the union has never filed a grievance with regard to the change in the definition of who could be subjected to random drug testing. (Dep. of Johnson at p. 11).

In addition to his claims concerning the drug testing policy, Krieg claims that Superintendent Antrobus defamed him approximately one week prior to the October 28, 2004 drug test. There had been a large marijuana bust in the City of Marion in October, 2004. Krieg was in Superintendent Antrobus' office shortly thereafter and while speaking about the drug bust, Superintendent Antrobus allegedly commented that the police "got your stash," referring to Krieg. (Dep. of Krieg at p. 50). Superintendent Antrobus was pointing to a newspaper article about the marijuana bust at the time he made the statement. (Dep. of Krieg at p. 49). Krieg responded by saying that it was not his stash. The conversation ended at that point and Superintendent Antrobus never brought the topic up again. (Dep. of Krieg at p. 50). The statements were made in front of Johnson. Johnson admits that Superintendent Antrobus' comments were made in a joking manner and that Krieg did not appear to be offended by any comments made by Superintendent Antrobus. (Dep. of Johnson at p. 18). While Superintendent

Antrobus admits making a comment to Krieg regarding "his stash of marijuana," Superintendent

Antrobus insists that the comment was made jokingly. (Dep. of Antrobus at p. 46, 47). Krieg

admits that no one has treated him any differently after Superintendent Antrobus' comments.

(Dep. of Krieg at p. 52).

## III. ARGUMENT

### A.  Neither Krieg Nor The Union Can Raise Constitutional Claims Because The Union Agreed To Drug Testing Of Its Members In Article XXI Of The 2003-2004 CBA

The defendants initially submit that as the Union consented to drug testing of all of its

members in Article XXI of the 2003-2004 CBA, neither Krieg nor the Union may now raise

constitutional challenges to the language of the drug testing policy in the 2004 Manual.  It is

undisputed that in Article XXI of the 2003-2004 CBA, the Union agreed to subject **all** street and

sanitation workers to drug testing in compliance with the City of Marion's Drug and Alcohol

Policy.  It is further undisputed that Section 2 of Article XXI acknowledges that drug testing may

be conducted randomly.  The 2003-2004 CBA is all-inclusive of its members in Article XXI of

the 2003-2004 CBA, neither Krieg nor the Union may now raise constitutional challenges to the

language of the drug testing policy in the 2004 Manual.  It is undisputed in Article XXI of the

2003-2004 CBA, the Union agreed to subject **all** street and sanitation workers to drug testing in

compliance with the City of Marion's Drug and Alcohol Policy.  It is further undisputed that

Section 2 of Article XXI acknowledges that testing may be conducted randomly.  The 2003-2004

CBA is all-inclusive, as there are no special exceptions or exemptions made for those few street

and sanitation workers, like Krieg, who did not possess a CDL.

The Union was selected by the employees of the Street and Sanitation Department of the

City of Marion to be their exclusive representative.  As such, the Union may agree to terms and

conditions of employment that are contractually binding on its members.

Courts have held that a union, "acting as an exclusive bargaining agent, may validly consent to drug testing on behalf of the employees it represents." Geffre v. Metropolitan Council, 174 F.Supp.2d 962, 965 (D.Minn. 2001). See also, Dykes v. SEPTA, 68 F.3d 1564, 1569 (3rd Cir. 1995) (holding that a union may expressly or implicitly consent to drug testing of the employees it represents); Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807, 828 (3rd Cir. 1991) (holding that "a public employees union acting as an exclusive bargaining agent may consent to drug testing on behalf of the employees it represents"); Utility Workers of Am. V. Southern Cal. Edison, 852 F.2d 1083, 1086 (9th Cir. 1998) ("to the best of our knowledge, … no court has held that the right to be free from drug testing is one that cannot be negotiated away…."); Ware v. City of Buffalo, 186 F.Supp.2d 324, 337-38 (W.D.N.Y. 2001) (union may validly consent to terms and conditions of employment, such as submission to drug testing, that implicate employees' Fourth Amendment rights). Thus, unless a union employee, like Krieg, can demonstrate a breach of the union's duty of fair representation, the union employee is bound by the union's consent. Bolden, 953 F.2d at 828.

As the Union consented to random drug testing in Article XXI of the CBA, Krieg is bound by that consent and neither he nor the Union may raise constitutional challenges to the language in the City of Marion's drug testing policy in the 2004 Manual. The Dykes Court underscored the importance accorded the terms of the collective bargaining agreement by holding:

> Even where a drug testing policy has been held to be constitutionally infirm, a public employee may not pursue a civil rights suit based upon that infirmity where his union and his employer agree to operate that policy. 68 F.3d at 1570.

In Bolden, the Court emphasized the rational for preventing an individual employee from

raising a constitutional claim on an issue that is the subject of a CBA:

> Through collective bargaining, a public employer and union can reach agreement on detailed factual questions … that may have important implications under the Fourth Amendment.  <u>If individual public employees may litigate such questions despite the resolution reached through collective bargaining, the utility of collective bargaining with respect to drug testing in the public sector would be greatly diminished.</u> In sum, we conclude that a public employee union acting as exclusive bargaining agent may consent to drug testing on behalf of the employees it represents….. [I]ndividual employees are bound by such express consent.  963 F.2d at 828 (Emphasis added)

Here, it is undisputed that the Union consented to random drug testing of **all** Street and Sanitation Department employees in Article XXI of the 2003-2004 CBA.  Thus, under the authorities cited herein, no Fourth Amendment challenges may be raised.

### B. <u>Fourth Amendment Claims</u>

Even if the constitutional challenge is properly before the Court, the defendants are entitled to summary judgment for two reasons.  First, as Krieg admittedly operated vehicles and heavy equipment which might cause injury to the public or co-workers if operated while under the influence of drugs, Krieg was a safety-sensitive employee and therefore random drug testing was not violative of his Fourth Amendment rights.  Second, as it is undisputed that at least some City of Marion employees may be subjected to random drug testing, for example employees holding CDL licenses, the Union's facial challenge to the constitutionality of the drug testing policy cannot succeed.

### 1. **Krieg Was A Safety Sensitive Employee And Random** <u>Drug Testing Was Permissible Under The Fourth Amendment</u>

Initially, the defendants question whether Krieg has standing to pursue a Fourth Amendment claim because he refused to submit to the drug test and, therefore, no search and seizure within the meaning of the Fourth Amendment ever occurred as to Krieg.  Nevertheless, defendants acknowledge those cases which hold that an employee may raise a Fourth

Amendment challenge to an order to undergo a drug screen, if the refusal to comply with the order has adverse consequences, such as termination of employment. See e.g., Jackson v. Gates, 975 F.2d 648, 653 (9th Cir. 1992).

Even if Krieg may properly raise a Fourth Amendment challenge to the random drug testing, the defendants are entitled to summary judgment because the evidence is that Krieg's job duties were safety sensitive duties and, as a result, random drug testing is constitutionally permissible. As a general rule, a search, which would include drug testing, must be based upon individualized suspicion or wrongdoing for the search to be considered reasonable. Chandler v. Miller, 520 U.S. 305, 313, 117 S.Ct. 1295, 1301, 137 L.Ed.2d 513 (1997). Nevertheless, the Supreme Court has upheld drug testing even absent reasonable suspicion of drug use or impairment when such testing serves "special needs, beyond the normal need of law enforcement." Skinner v. Railway Labor Executives Association, 489 U.S. 602, 619, 119 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989).

"There is no general Fourth Amendment prohibition against suspicionless and random drug testing." Crager v. Board of Education of Knott County, Kentucky, 313 F.Supp.2d 690, 693 (E.D.Ky. 2004). The Fourth Amendment permits random drug testing of government employees engaged in safety-sensitive functions. National Treasury Employees Union v. Von Raab, 49 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Safety sensitive positions are those positions that involve "discharge of duties fraught with risks of injury to others that even a momentary lapse of attention could have disastrous consequences." Skinner, supra, 489 U.S. at 628, 119 S.Ct. at 1419. The Skinner Court also noted that the employees subject to random drug testing could cause great human loss and harm before any signs of impairment may become noticeable to supervisors or others, as such employees will seldom display any outward signs

detectable by lay persons, or, in many cases, even physicians.  Id.

Numerous Courts have upheld suspicionless random drug testing in a variety of circumstances.  For example, in Von Raab, the Supreme Court recognized a legitimate interest in testing for off-duty drug use by United States Customs Service employees interested in transfer or promotion to positions involving exceptional duties including drug interdiction and the use of firearms.  489 U.S. at 668-72, 109 S.Ct. at 1392-94.  In Skinner, the Supreme Court held that random drug testing of railroad workers in safety sensitive positions does not violate the Fourth Amendment despite the lack of a triggering event like an accident or safety rule violation.  In International Brotherhood of Teamsters v. Department of Transportation, 932 F.2d 1292, 1306 (9th Cir. 1991), the Court found a "compelling interest," in preventing drivers of commercial vehicles from using illegal drugs while operating vehicles as justification for random drug testing under the Fourth Amendment.  In American Fed'n of Gov. Employees v. Skinner, 885 F.2d 884, 892 (D.C.Cir. 1989), the Court upheld random drug testing of Department of Transportation motor vehicle operators who drive passenger-laden shuttle buses in light of "obvious safety interests."  In Transport Workers' Union of Phil. Local 234 v. Southeastern Pa. Transp Auth., 884 F.2d 709, 712 (3rd Cir. 1989), the Court upheld a public transportation authority's random drug and alcohol urinalysis of employees despite the lack of a basis in "individualized suspicion."  In  Keaveney v. Town of Brookline, 937 F.Supp. 975, 986-87 (D.Mass. 1996), the Court held that random drug testing of employees who drove commercial vehicles such as dump trucks, cranes and tractors was permissible even though the employees did not regularly transport passengers in the vehicles because the employees did operate "large vehicles that could be deadly in the hands of an employee lacking judgment because of drug or alcohol intake."

Krieg will undoubtedly attempt to distinguish this line of cases by arguing that he did not

occupy a safety sensitive position because he did not possess a CDL and no one from the City of Marion ever informed him his position with the Street Department was a safety sensitive position. The Defendants submit that the lack of a CDL is not determinative of whether Krieg performed job functions which could be considered safety sensitive. After all, Krieg himself admits that he could injure himself, co-workers, and the general public if he operated vehicles and equipment under the influence of drugs or alcohol. The Union President, Johnson, agrees. Superintendent Antrobus opines that all of his employees are safety sensitive employees because they regularly operate large vehicles and heavy equipment in areas open to the public and co-workers.

The facts here are similar to those in the case of <u>Middlebrooks v. Wayne County</u>, 521 N.W.2d 774 (Mich. 1994). Middlebrooks applied for a permanent position as a general service worker. The position required him to operate saws, wood chippers, and a front-end loader on Wayne County Road Commission premises. He was also required to operate a riding lawn mower on highway medians and embankments and drive trucks, including dump trucks carrying equipment from work sites to repair facilities used by the Commission. Middlebrooks submitted to a preemployment physical which included urinalysis testing for controlled substances. The test was positive for opiates and cocaine, which disqualified him from employment. Middlebrooks filed suit alleging that the drug test violated his Fourth Amendment rights. The Trial Court granted summary judgment for the defendants on the grounds that drug testing is permitted under the Fourth Amendment, where the position involves the operation of heavy machinery. 521 N.W.2d at 776. However, the Michigan Court of Appeals reversed.

In reinstating summary judgment for the defendants, the Michigan Supreme Court first surveyed Supreme Court and other precedent on random drug testing for employees who operate

vehicles and machinery in the general public.  The Court held that although the general service

worker position for which Middlebrooks applied did not involves duties as a commercial driver,

his job responsibilities would involve tasks which might cause injury to the general public,

thereby justifying random drug testing:

> Operation of a riding lawn mower, especially on highway medians and embankments, and driving front-end loaders, trucks, and other equipment between a work site and repair facility, might result in serious injury from "momentary lapse[s] of attention" characteristic of illegal drug use.  Middlebrooks had a reduced expectation of privacy in not being subjected to urinalysis drug screening by the government as a result of his application for a position with a governmental agency as a laborer, in which potentially serious accidents might result from collisions between a mower, being operated on a median or embankment, and vehicles on the highway, often traveling at high rates of speed.  A riding law mower, front-end loader, or truck might become "lethal" when "operated negligently."  Thus, we conclude that the balance mandated by the Fourth Amendment tips in favor of permitting the state to require urinalysis testing of Middlebrooks although the general service-worker position  that he sought is not "regulated pervasively" like that of a railroad employee, or commercial driver.

>    *    *    *    *    *

> The operation of lawn mowers and other mechanical equipment on or near roads designed primarily for cars, vans, and trucks poses a greater threat to traffic safety than the operation of ordinary automobiles, vans, and trucks.  521 N.W.2d at 780 (Emphasis added)

  In Plane v. United States, 796 F.Supp. 1070 (W.D.Mich. 1992).  The AFL-CIO sought to

have mandatory random urinalysis drug testing declared unconstitutional as applied to heavy

equipment operators.  On cross-motions for summary judgment, the District Court held that

heavy equipment operators, which included employees who operated fork-lifts, tractors and

cranes, could be subject to random drug testing because there was a potential for them to be a

danger to the health and safety of other employees as well as the general public.  The Court

rejected the AFL-CIO's argument that random drug testing was constitutionally impermissible

because the employees did not transport passengers as part of their duties and had little contact

with the general public.  The Court held that although the heavy equipment did not carry

passengers, "it is obvious that the safety and health of people can be significantly endangered by employees operating equipment that do not carry passengers."  796 F.Supp. at 1076.  Citing to Skinner, the Court concluded that the government "has a compelling interest in detecting and deterring drug use by employees operating such equipment."  Id.  As operating heavy equipment created a "great risk of harm to other persons in the area if the operator is impaired due to drug use," the dangers involved justified random drug testing, even if the safety of the general public is not involved.  Id. at 1077.

As in Plane and Middlebrooks, there is a risk of serious harm to the public if Krieg, or any other Street and Sanitation Department employee, operates vehicles, heavy equipment and machinery while under the influence of alcohol or drugs.  The work performed by Krieg was safety sensitive work, even if he was never advised that he held a safety-sensitive position.  Under the authorities cited herein, Krieg's duties are similar to those in other jobs where Courts have upheld random drug and alcohol testing as being reasonable and not violative of the Fourth Amendment.  Thus, even if Krieg's constitutional challenge is properly before the Court, the defendants are entitled to summary judgment because the random drug test was constitutionally permissible under the authorities cited herein.

## 2.  The Substance Abuse Policy Is Not Unconstitutional On Its Face

In Count IV of the Complaint, the plaintiffs allege that "the June 7, 2004 Substance Abuse Policy is unconstitutional on its face because it allows searches and seizures of the urine of Local 3063's members employed in the Street and Sanitation Department without individualized suspicion."  (Complaint, ¶25).  The facial challenge to the policy faces a significant uphill battle.  When the constitutionality of a policy is facially challenged, the Court must determine "whether the test contemplated by the [policy] can ever be conducted.  Skinner v.

_Railway Labor Executives Association_, 489 U.S. 602, 632-33 n.10, 109 S.Ct. 1402, 1421 n.10, 103 L.Ed.2d 639 (1989). In other words, the challenger must "establish that no set of circumstances exists under which the [policy] would be valid. _United States v. Salerno_, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

For the reasons set forth in the prior subsection, it is highly likely that at least some Street and Sanitation Department employees may properly be required to submit random drug tests. It is undisputed that a majority of the employees of the Street and Sanitation Department maintain CDL licenses. The Union cannot show that there are no circumstances under which one of its members may be subjected to a random drug test. In fact, case law compels otherwise. As indicated, it is well-established that individuals in safety sensitive positions, which would include employees holding CDLs, may be constitutionally required to submit to random drug testing. Thus, the Substance Abuse Policy is facially valid.

### C. Due Process Claim

In Count I of the Complaint, Krieg alleges that the defendants denied him due process of law by "discharging plaintiff without affording him the pre-termination hearing required by the due process clause of the Fourteenth Amendment." (Complaint, ¶18). While Krieg claims in paragraph 3 of the Complaint that the CBA "permitted his employment to be terminated only in the event he was discharged for just cause," review of the 2003-2004 CBA contains no express provision as to just cause termination. Krieg was an at will employee and therefore has no protected property interest in continued employment. _Moulton v. Vigo County_, 150 F.3d 801, 805 (7th Cir. 1998); _Phegley v. Indiana Dept. of Highways_, 564 N.E.2d 291, 295 (Ind.Ct.App. 1990).

Even if the 2003-2004 CBA somehow gives Krieg a property interest in his employment,

defendants submit that Krieg cannot pursue a due process claim under §1983 because it is undisputed that Krieg failed to avail himself of the final step of the grievance procedure in Article V of the 2003-2004 CBA: arbitration. Article V states that "[i]f either side is dissatisfied with the decision of the Board of Works, a request to go to Step 4 (arbitration) **shall** be made within fifteen (15) work days." (Emphasis added). Krieg availed himself of the first three steps of the grievance procedure, the third step (although he did not personally attend) being the hearing before the Board of Public Works. Dissatisfied with the Board of Public Works' decision to terminate his employment for refusing to take the drug test, Krieg's final step under the 2003-2004 CBA was mandatory arbitration, a step Krieg admits he did not take.

Krieg's failure to proceed to arbitration as provided for in the 2003-2004 CBA precludes his due process claim. Courts have held that where a due process claim is raised against a public employer and there is a grievance and/or arbitration procedure in place, the failure to exhaust those remedies bars a due process challenge. See e.g., Narumanchi v. Bd. Of Trustees of Conn. State Univ., 850 F.2d 70, 72 (2nd Cir. 1988)(affirming dismissal of a tenured teacher's procedural due process claim because the teacher failed to submit to his union's grievance procedures, as set forth in a collective bargaining agreement, after he was suspended without pay); Aronson v. Hall, 707 F.2d 693, 694 (2nd Cir. 1983)(per curiam) (affirming a district court's dismissal of a plaintiff's procedural due process claim because "[h]aving chosen not to pursue available administrative review, [plaintiff] is hardly in a position to claim that such review denied him due process"); Keim v. County of Bucks, 322 F.Supp.2d 587, 590-91 (E.D. Pa. 2004) (failure of county corrections officer to go through last of four steps in collective bargaining agreement's grievance/arbitration procedure when appealing a reprimand precluded his procedural due process claim).

Finally, even if the Court determines Krieg had a property right in his employment and was not required to submit to arbitration, the evidence before the Court plainly demonstrates that due process was satisfied. Due process requires that before a governmental entity may deprive a person of a constitutionally protected property interest, it must conduct some type of hearing accompanied by notice and an opportunity to be heard. Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). Before a person may be deprived of a constitutionally protected property interest in public employment, due process requires that a pre-termination hearing be held. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The pre-termination hearing need not be elaborate. The essential requirements are merely notice and an opportunity to respond, orally or in writing. Loudermill, 470 U.S. at 545, 105 S.Ct. at 1497.

Here, it is undisputed that Krieg was afforded the essential requirements of due process. He was given ample notice that the Board of Public Works would be considering the termination of his employment. Krieg was provided with an opportunity to present his side of the story at the Board of Public Works' meeting. However, he chose not to avail himself of this opportunity. This does not create a defect in the due process offered to him. Krieg chose not to attend the hearing and therefore waived his right to raise a due process claim. In the arena of employees terminations, the Seventh Circuit Court of Appeals has repeatedly held that an employee waives the right to a pre-termination hearing when an employer offers a hearing and the employees fails to accept. See e.g., Flynn v. Sandahl, 58 F.3d 283, 288 (7th Cir. 1995) ("Employee cannot claim lack of due process when his employer offered him such a pre-termination hearing and he refused to attend."); Cliff v. Board of School Commissioners of the City of Indianapolis, Indiana, 42 F.3d 403, 413-14 (7th Cir. 1994) (finding that employee waived right to a pre-termination

hearing by failing to accept an earlier offer for such a hearing); <u>Fern v. Thorp Public School</u>, 532 F.2d 1120, 1131-32 (7th Cir. 1976) (holding school teacher to be terminated for cause waived his claim of procedural due process violation when he knew the time, place and purpose of the pre-termination hearing before the school board but chose not to attend after conferring with his counsel). Simply put, one "cannot sue in federal court to secure a right which he declined when it was voluntarily offered to him." <u>Suckle v. Madison General Hospital</u>, 499 F.2d 1364, 1367 (7th Cir. 1974).

## D. <u>Defamation Claim</u>

If the Court grants defendants' Motion for Summary Judgment on all federal claims, the Court may decline to exercise supplemental jurisdiction over Krieg's state law defamation claim against Superintendent Antrobus. 28 U.S.C. §1367(c)(3). When all federal claims "drop out" prior to trial, the District Court should not retain a state law claim absent "extraordinary circumstances." <u>Wentska v. Gellman</u>, 991 F.2d 423, 425 (7th Cir. 1993). No such extraordinary circumstances exist here.

Even if this Court exercises supplemental jurisdiction over Krieg's defamation claim, summary judgment in favor of Superintendent Antrobus is appropriate for several reasons. First, under Indiana law, a defamation claim against a government entity or employee falls within the scope of the Indiana Tort Claims Act, thereby requiring compliance with the notice provisions of the Indiana Tort Claims Act. <u>Celebration Fireworks, Inc. v. Smith</u>, 727 N.E.2d 450 (Ind. 2000); <u>Bienz v. Bloom</u>, 674 N.E.2d 998 (Ind.Ct.App. 1996). Indiana Code §34-13-3-8 provides that a Notice of Tort Claim is to be filed against a political subdivision within 180 days after the loss occurs. In addition, "a person may not initiate a suit against a governmental entity unless the person's claim has been denied in whole or in part." I.C. §34-13-3-13. Here, there is no

indication of a complaint that Krieg filed a Tort Claim notice with respect to his defamation claim, or that any such notice was filed prior to filing of the lawsuit on November 17, 2004.

Even if Krieg complied with the provisions of the Indiana Tort Claims Act, summary judgment in Superintendent Antrobus' favor is appropriate as Krieg cannot satisfy all of the requisite elements of a defamation claim under Indiana law. Those elements are (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. Davidson v. Perron, 716 N.E.2d 29, 37 (Ind.Ct.App. 1999). Even assuming, arguendo, that Superintendent Antrobus' alleged statement, "they got your stash," is a communication with sufficient defamatory imputation, Krieg cannot establish the requisite element of malice in making any such statement. Superintendent Antrobus made the comment jokingly, and Union President Johnson, who overheard the comment, also believes Superintendent Antrobus was only joking when he made the comment.

## IV. CONCLUSION

For all of the foregoing reasons, defendants, by counsel, respectfully request that summary judgment be entered in their favor and against the plaintiffs, and for all other just and proper relief in the premises.

Respectfully submitted,

CARSON BOXBERGER LLP


By  s/Robert T. Keen, Jr.
          Robert T. Keen, Jr./#5475-02


By  s/Diana C. Bauer
          Diana C. Bauer/#11906-64
Attorneys for Defendants

1400 One Summit Square
Fort Wayne, IN 46802
Telephone: (260) 423-9411
F:\Bliss McKnight 11,498\KRIEG, Robert A.509\summary judgment - memo.doc
DCB/mk

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of December, 2005, a true and correct copy of the above and foregoing document was electronically filed and/or mailed to:

William R. Groth
Geoffrey S. Lohman
Fillenwarth Dennerline Groth & Towe
1213 N. Arlington Avenue, Suite 204
Indianapolis, IN 46219


   s/Diana C. Bauer