UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

ROBERT A.  KRIEG, <u>et al</u>.,               )
                                              )
       Plaintiffs,                   )
                                              )
  v.                                        )        CIVIL NO.  1:04cv430
                                              )
WAYNE SEYBOLD, <u>et al</u>.,                 )
                                              )
      Defendants.                   )

<u>OPINION AND ORDER</u>

This matter is before the court on a "Motion for Partial Summary Judgment as to

Liability", filed by the plaintiffs on December 1, 2005.  The defendants responded to the motion

on January 13, 2006, to which the plaintiffs replied on February 2, 2006.

Also before the court is a motion for summary judgment filed by the defendants on

December 1, 2005.  The plaintiffs responded to the motion on January 13, 2006, to which the

defendants replied on February 2, 2006.

A telephone conference was held in this matter on March 15, 2006, and supplemental

briefing was submitted to this court by the plaintiffs on March 24, 2006, and by the defendants

on March 27, 2006.

For the following reasons, the plaintiffs' motion for partial summary judgment will be

denied and the defendants' motion for summary judgment will be granted as to all federal

claims.  The plaintiffs' state law defamation claim will be dismissed without prejudice.

<u>Summary Judgment Standard</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the

2

motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

The plaintiffs have set forth the following facts which they assert are not in dispute. Robert Krieg ("Krieg") was  employed by the City of Marion, Indiana's Street and Sanitation Department from June 1985 until his alleged discharge on October 28, 2004.  Krieg Dep.13-14. Jack Antrobus has served as the Superintendent of Street and Public Works since January 1, 2000. Antrobus was also Krieg's immediate supervisor.  Antrobus Dep. 4;  Krieg Dep. 15.  Krieg and other employees in the Street and Sanitation Department are represented by the American Federation of State, County and Municipal Employees Local No. 3063 ( "Local 3063"), which in turn is affiliated with AFSCME Council 62 and is signatory to a collective bargaining agreement ("CBA") with the City of Marion covering those employees. The CBA governing this case was effective January 1, 2003 to December 31, 2004.  Clouse Dep. 6; Krieg Dep. 22.  On the  date of his October 28, 2004 discharge, and for approximately six (6) months prior, Krieg served as

4

Local 3063's Vice-President.  Krieg Dep. 22.

Before 2001, Street and Sanitation Department employees were given prior notice of  all random drug testing.  Antrobus Dep. 6; Krieg Dep. 33, Pls. App., Ex. B, at 14-16 .  As a result of changes agreed to during the 2001 negotiations, the new labor agreement between the City and Local 3063 allowed for random drug testing performed in accordance with the City's Personnel Manual, which had previously been implemented on June 1, 2001.  Antrobus Dep. 7; Krieg Dep. 46-47.  The terms of the June 1, 2001 City of Marion Personnel Policies Handbook allowed for testing in three instances: (1) reasonable suspicion, (2) post-accident and (3) to comply with the requirements of the Federal Carrier Safety Regulations, which mandated random, unannounced testing of employees occupying "safety sensitive positions", which included those positions that "require an employee to operate a commercial motor vehicle and/or hold a commercial driver's license".  Pls. App., Ex. C, at 8-9. The CBA  governing this case allowed for drug testing post accident, upon reasonable suspicion,  or randomly as per the current City Policy.  Pls. App., Ex. A, at 15.

Though the current CBA requires all newly-hired employees in the Street and Sanitation Department to obtain a valid commercial driver's license ("CDL") within six months of his/her hire date, employees such as Krieg who were hired before September 10, 2000 are not required to possess a CDL as a condition of retaining employment.  These individuals have a "grandfather" exemption from this requirement memorialized in Article XXII of the CBA.  Pls. App., Ex. A, at 17; Antrobus Dep. 14-15; Krieg Dep. 74, 78.  Krieg has never held a CDL, Krieg Dep. 18, and was one of five or six long-time employees in the Street and Sanitation Department who did not possess a CDL because of the contractual exemption.  Krieg Dep. 78;

Antrobus Dep. 15-16.  This prevented him from being assigned to operate several larger pieces of heavy equipment used by other Street and Sanitation Department employees.  Antrobus Dep. 24-25; Krieg Dep. 78.

Krieg's regular job duties varied from day-to-day and season-to-season but regularly included such activities as patching holes in city streets, sealing cracks, plowing snow using a dump truck, mowing city property with a riding lawn mower, loading salt or sand into City vehicles with a front-end loader or backhoe, and occasionally directing traffic on construction projects. Krieg Dep.15-20; Antrobus Dep. 20-22.   Krieg never declined to perform any job duty assigned by Antrobus. Antrobus Dep. 22.  He had never been involved in any incidents or accidents causing harm to another employee or member of the general public.  Krieg Dep. 21, 86.

Krieg had a previous positive test for marijuana which occurred after an unannounced random urinalysis in November 2002, Krieg Dep. 30; Antrobus Dep. 27-28, for which he was suspended for approximately 30 days.  However, because of a prior injury, Krieg received worker's compensation benefits during the entire period of his suspension and lost no pay.  Krieg Dep. 31; Antrobus Dep. 27-29.  Krieg filed a grievance regarding the November 2002 test claiming that as a non-CDL holder he should not have been subjected to urinalysis in the absence of probable cause.  He also retained private counsel.  Following an exchange of letters between Krieg's counsel and the City, Pls. App., Ex. D, the City eventually acquiesced to Krieg's contention that his testing was improper and he was ultimately reinstated without being required to complete the other contractual requirements for return to work following a positive urinalysis, including the requirement that he complete a drug test prior to his return.  Krieg Dep. 83-84;

6

Antrobus Dep. 28-29; Pls. App., Ex. E, ¶ 2.  Antrobus testified that he did not agree with this reinstatement and therefore refused to sign the reinstatement agreement, though it does not appear that his signature was required on the reinstatement agreement.  Antrobus Dep. 30; Pls. App., Ex. E.

Following Krieg's November 2002 urinalysis, Antrobus and the City's former mayor were uncertain whether they could randomly test Street and Sanitation Department employees who were not required by the CBA to possess a CDL.  Antrobus Dep. 31.  Accordingly, Antrobus decided that no employee not required to possess a CDL,  including Krieg, would thereafter be subjected to random testing.   Krieg Dep. 38-39, 94; Antrobus Dep. 31-32. Antrobus testified that he considers all employees who work at the Street and Sanitation Department to be "safety sensitive" employees, though he has never communicated this belief to the employees.  Antrobus Dep. 13-14; Krieg Dep.48, 79.

After the election of Defendant Wayne Seybold as Mayor in November 2003, Antrobus (who was retained by the new Seybold Administration) expressed to Seybold that there should be "zero tolerance" for drug use in City government and that *every* employee should henceforth be subject to unannounced, random urinalysis.  Antrobus believed that Seybold shared his views in this regard. Antrobus Dep.  32,  34-35. However, while Seybold's administration was formulating its new personnel policies, Antrobus decided not to have any random tests conducted on any employees under his supervision.  Antrobus Dep. 32-33.

On June 7, 2004, the City released its new Personnel Policy and  Procedures Manual (hereinafter the "PPPM."), which included changes broadening the circumstances under which its

7

employees could be subject to mandatory urinalysis. One of the stated purposes of the Substance

Abuse Policy in the new PPPM is to "prohibit the unlawful manufacture, distribution,

dispensing, possession or use of controlled substances".  Antrobus Dep. 35-36 and Pls. App., Ex.

L, Sec. 7.05 ¶A.2.  Antrobus broadly interpreted the new PPPM as an invitation for him to

subject all employees under his supervision, including non-CDL holders, to urinalysis without

prior announcement or reasonable suspicion.  Antrobus Dep. 37-38.

      The City put the June 7, 2004 PPPM into effect without any negotiations or advance

notice to Local 3063 or any other unions that have bargaining relationships with the City.

Antrobus Dep. 53; Johnson Dep. 8; Clouse Dep. 15.  To protest  this unilateral implementation

arguably done in violation of Article VIII, Section 2 of the CBA, most of Local 3063's members

employed in the Street and Sanitation Department, including Krieg, refused to acknowledge

either its receipt or its binding nature.  Local 3063 also filed a grievance regarding this policy

change.  Antrobus Dep. 53-54, Pls. App., Ex. 4; Johnson Dep. 10; Clouse Dep. 16. They later

agreed to sign a document merely acknowledging receipt of the document.  Antrobus Dep. 57,

Ex. 5.

      The June 7, 2004 PPPM states that "All employees will be subject to urine drug testing

and breath alcohol testing" and that any employee "who refuses to comply with a request for

testing shall be removed from duty and their employment terminated". Pls. App., Ex. L, Sec.

7.05 A. ¶5.4.  The PPPM in Section 7.05, subsection B, ¶6.0 goes on to state that "[a]nalytical

urine testing . . . may be conducted when circumstance [sic] warrant or as required by federal

regulations," and that "all safety sensitive employees will be tested on a random basis as

specified in 49 C.F.R. 382".  Those federal regulations set forth who must be tested, what

percentages of employees must be tested, and the procedures to be used.  *See* 49 C.F.R. §382.101, *et seq*.  Many of these requirements are similar to the requirements the City explicitly adopted in its prior Personnel Policies Handbook at paragraph 1.6. Pls. App., Ex. C at 6-8.  Despite the complex nature of these regulations, Antrobus  never announced any of these changes or explained  how they affected his employees.  In his view such an announcement or explanation was unnecessary because "[e]veryone was under the understanding of how I felt".  Antrobus Dep. 58-59.

On October 28, 2004 Antrobus scheduled a "random" test for every one of the approximately forty (40) Street and Sanitation Department employees under his supervision, the first such testing under the new PPPM.  The plaintiffs contend that this drug test was in reality a suspicionless mass search of all Department employees' urine, including those employees such as Krieg whose job duties did not require the possession of a CDL.  Antrobus Dep. 39.  Antrobus scheduled this test several weeks in advance by contacting and making arrangements with the City's vendor, Indiana Testing.  He also discussed the planned urinalysis with Seybold, though it is not clear whether Antrobus told him that he planned to test *all* Street and Sanitation Department employees without notice.  Antrobus Dep. 40-41.  Antrobus knew of no other City departments which had conducted a test of all employees at one time.  Antrobus Dep. 52. He had no reasonable suspicion that any of his employees were using, selling or in possession of any illegal substances.  He had  no  prior indication that any employee had shown up  for work under the influence of drugs or alcohol. Antrobus Dep. 42.

When employees arrived at work on the morning of October 28, 2004, all of them except Antrobus's secretary were called to a meeting at which Antrobus announced that a urinalysis of

all employees would be conducted.  Krieg Dep. 33-34; Antrobus Dep. 17, 48-50.  Krieg

immediately stated  his  refusal to be tested.  Krieg Dep. 35; Antrobus Dep. 48-50.  Krieg had

long been contemplating refusing to participate in any future random urinalysis because his job

did not require him to have a CDL.  Krieg Dep. 38, 67, 93.  After Krieg voiced his intent to

refuse the test, Antrobus asked him if he understood that refusal would be treated as a positive

test. Krieg Dep. 37; Antrobus Dep. 48.  Antrobus then asked Local 3063 President Stephen

Johnson if he had heard Krieg's refusal, and Johnson stated that he had.  Johnson Dep. 12;

Antrobus Dep. 49. Antrobus then told Krieg that he was "no longer employed here" and needed

to "leave the building". Krieg Dep. 37;  Antrobus Dep.49.

As he was leaving the garage, Krieg stopped to use the pay phone to contact his attorney.

Krieg Dep. 37, 42; Antrobus Dep. 50.  Once outside the building, Krieg asked Antrobus if he

was

fired.  Krieg recalls that Antrobus told him he was "fired", and Antrobus recalls that he may

have said "'you are terminated,' something of that nature".  Krieg Dep. 42, 71; Antrobus Dep.

50-51.  In either event, Antrobus clearly conveyed the message that Krieg's employment had

ended.  Krieg Dep. 42, 71.  Antrobus again demanded that Krieg leave, threatening to call the

police to remove him if necessary.  Krieg Dep. 42; Antrobus Dep. 50.  Krieg thereupon quietly

departed.  Krieg Dep. 43; Antrobus, Dep. 50.  Antrobus then proceeded to drug test all of the

remaining employees.

The new PPPM provides in Section 8.04 for a pre-disciplinary conference whenever it is

determined that an employee may have committed an offense which could result in termination

"to give the employee an opportunity to offer an explanation regarding the alleged  misconduct".

10

Pls. App., Ex. L.

Sometime later that day, Antrobus communicated to the Mayor the results of the tests, including Krieg's refusal and subsequent expulsion from the property.  Antrobus Dep. 51. Later that same day the police also conducted a search of employee lockers belonging to Krieg and fellow employee George Gonzales at the Street and Sanitation Department garage, using K-9 dogs, but not until the City had first obtained a search warrant from a Superior Court judge. Johnson Dep. 19-20. The record does not reflect that any contraband was discovered during this search.

A few days later a meeting was held on or about November 1 at City Hall between Local 3063 and City officials.  Krieg Dep 44; Clouse Dep. 18.  Local 3063 representatives believed this meeting had been called to discuss possible resolution of this dispute, but the City's representatives stated that they did not have the authority to overturn Krieg's termination. Clouse Dep. 18.

The next procedural step was the Board  of  Public Works meeting on November 15. However, after being told by Clouse that no termination had ever been overturned by the Board of Public Works, and on advice of his attorney, Krieg did not attend.  Krieg Dep. 55; Clouse Dep. 20. Clouse thus represented Krieg's interests at that meeting. Clouse Dep. 19.  Clouse was of the opinion that an arbitrator selected under the CBA would not have the  authority to rule on the constitutionality of the search, and thus advised Krieg to explore legal options.  Clouse Dep. 20. The Board subsequently upheld Krieg's termination.  Clouse Dep. 19; Pls. App., Ex. G.

Subsequent to the October 28, 2004 mass urinalysis, Antrobus reverted to the pre-

existing, less sweeping urinalysis procedures, namely, "random" testing of no more than 50% of the employees in the department at a single time.  Johnson Dep. 21.

Krieg claims that the City violated his right to due process by failing to conduct a pre-termination hearing prior to his October 28, 2004 termination.  Krieg also asserts that mandatory urinalysis by a government employer is a search within the meaning of the Fourth Amendment, and that the City's mass, suspicionless testing cannot be justified by any "special need".  Krieg further claims that the City violated the guidelines of its own unilaterally announced substance abuse program when it engaged in mass, suspicionless urinalysis of Krieg and all of his fellow employees on October 28, 2004.  Lastly, Krieg asserts a state law defamation claim arising from comments allegedly made about him by Antrobus.

The defendants argue that neither Krieg nor the Union can raise constitutional claims because the Union agreed to drug testing of its members in Article XXI of the 2003-2004 CBA. The defendants further assert that even if the constitutional challenge is properly before the court, the defendants are entitled to summary judgment because Krieg admittedly operated vehicles and heavy equipment which might cause injury to the public or co-workers if operated while under the influence of drugs, and because it is undisputed that at least some City employees may be subjected to random drug testing and thus the Union's facial challenge of the constitutionality of the drug testing policy cannot succeed.

The court will first address the issue of whether the Union agreed to the testing and, if so, the effect of that agreement on the current lawsuit.

As noted above on October 28, 2002, the Union and the City of Marion entered into a Collective Bargaining Agreement ("the 2003-2004 CBA") for 2003 and 2004. Exhibit A. In

Article XXI of the 2003-2004 CBA, the Union agreed to comply with the City of Marion's drug and alcohol policy.[1]

### ARTICLE XXI – POLICY ON ALCOHOL AND ILLEGAL DRUGS

SECTION 1. **All Street and Sanitation workers shall comply with the CITY'S Drug and Alcohol Policy.**

SECTION 2. **Drug/Alcohol Testing may be conducted on Street and Sanitation workers post-accident, upon reasonable suspicion or randomly as per the current City policy.** A minimum of 50% of the employees shall be tested at least once a year.

\* \* \* \*

SECTION 5. …**Refusal to submit to the testing provided under this agreement shall be grounds for discipline up to and including termination**. (Emphasis added).

The City of Marion Personnel Policies Handbook in effect as of October, 2002, when the 2003-2004 CBA was signed, includes a drug testing policy which provided that any department head could require an employee to submit to drug testing when there was a reasonable suspicion that the employee was under the influence of drugs or alcohol, or after a City employee was involved in an accident. Exhibit C. In addition, the Handbook provided for random drug testing of all "safety-sensitive employees," and included within that definition "**all positions which require an employee to operate a commercial vehicle and/or hold a commercial driver's license**."

The defendants assert that it is undisputed in this case that Krieg operated commercial

---

[1] The defendants assert that it is noteworthy that the 2005 CBA contains the identical language whereby the Union agrees to comply with the City of Marion's drug and alcohol policy. The defendants state that the fact that the language remained the same is interesting given the fact that the 2005 CBA was signed in February, 2005, months after the present lawsuit was filed challenging the City of Marion's drug testing policy.

vehicles, which included a one-ton truck, a pick-up truck, a backhoe, and a front-end loader.

The plaintiffs, however, contend that none of the vehicles that Krieg operated were commercial

vehicles.  In an attempt to clarify this issue, the court held a telephone conference on March 15,

2006 during which the parties agreed to file supplemental briefs defining "commercial vehicle".

The plaintiffs state that the term "commercial motor vehicle" is a legal term of art which is

defined in the Federal Omnibus Transportation Employee Testing Act of 1991 ("FOTETA"), and

in the regulations promulgated by the Federal Highway Administration of the Department of

Transportation.  In FOTETA the term "commercial motor vehicle" is defined as a "motor vehicle

used in commerce to transport passengers or property that -

> (A)     has a gross vehicle weight rating or gross vehicle weight of at least 26,001
>          pounds, whichever is greater, or a lesser gross vehicle weight rating or gross
>          vehicle weight the Secretary of Transportation prescribes by regulation, but not
>          less than a gross vehicle weight rating of 10,001 pounds;
>
> (B)     is designed to transport at least 16 passengers including the driver; or
>
> (C)     is used to transport material found by the Secretary to be hazardous. . ."

49 U.S.C. §31301(4).  The Regulations promulgated by the Department of Transportation

prohibit a person from driving a commercial motor vehicle unless the driver has been issued an

unexpired commercial motor vehicle operator's license.   49 C.F.R. § 391.21(a) and (b)(5).  The

Regulations further provide that every person and all employers of such persons who operate a

"commercial motor vehicle" in commerce in any State is subject to the commercial driver's

license requirements in federal law and regulations.  49 C.F.R. §382.103(a)(1).  The regulations

also contain a definition of "commercial motor vehicle" which closely tracts the statutory

definitions set forth above.  See 49 C.F.R. §382.107.  the regulations found at 49 C.F.R. § 382

are specifically referenced in the City's drug testing policy in its June 7, 2004 Personnel Policy

14

and Procedure Manual at Section 7.05(B)(6.0) ("all safety sensitive employees will be tested on a random basis as specified in 49 CFR § 382").   Thus, the plaintiffs conclude that the small dump trucks Krieg drove clearly were not "commercial motor vehicles" as the term is defined in federal law.

The defendants, in turn, submit that the definition of  "commercial motor vehicle" in Section 1.6.2 of the 2001 Personnel Policies Handbook (which was incorporated into the applicable CBA) should be broadly interpreted and not narrowly construed as including only those vehicles that fit within the federal statutory definition.  The defendants point out that the vehicles operated by Krieg, which included a one-ton truck, are certainly not personal-type vehicles operated on a regular basis by the general motoring public.  The defendants contend that if the City of Marion intended for the drug testing provisions to be limited only to those employees holding a CDL, Section 1.6.2 would have so provided.  The defendants note that it is important that Section 1.6.2 is stated in terms of "and/or".  The defendants argue that by requiring any employee who either operates commercial vehicles, or holds a CDL, the City of Marion quite obviously intended to apply Section 1.6.2 of the Handbook to non-CDL employees who nevertheless operate commercial vehicles.  The defendants maintain that a narrower interpretation would make the phrase "operates a commercial motor vehicle" meaningless.  The defendants argue that in light of public policy considerations concerning drug use by employees who perform safety-sensitive work, which would include those non-CDL employees who drive smaller trucks or operate machinery and heavy equipment, a common-sense broad interpretation of "commercial vehicle" is appropriate.  This court agrees with the defendants and hold that Krieg operated "commercial vehicles" as that term was intended in the Handbook, and thus the

15

Union agreed to random drug testing for Krieg, even though he did not hold a CDL license.

The Union was selected by the employees of the Street and Sanitation Department of the City of Marion to be their exclusive representative. As such, the Union may agree to terms and conditions of employment that are contractually binding on its members. Courts have held that a union, "acting as an exclusive bargaining agent, may validly consent to drug testing on behalf of the employees it represents." Geffre v. Metropolitan Council, 174 F.Supp.2d 962, 965 (D.Minn. 2001). See also, Dykes v. SEPTA, 68 F.3d 1564, 1569 (3rd Cir. 1995) (holding that a union may expressly or implicitly consent to drug testing of the employees it represents); Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807, 828 (3rd Cir. 1991) (holding that "a public employees union acting as an exclusive bargaining agent may consent to drug testing on behalf of the employees it represents"); Utility Workers of Am. V. Southern Cal. Edison, 852 F.2d 1083, 1086 (9th Cir. 1998) ("to the best of our knowledge, … no court has held that the right to be free from drug testing is one that cannot be negotiated away…."); Ware v. City of Buffalo, 186 F.Supp.2d 324, 337-38 (W.D.N.Y. 2001) (union may validly consent to terms and conditions of employment, such as submission to drug testing, that implicate employees' Fourth Amendment rights). Thus, unless a union employee, like Krieg, can demonstrate a breach of the union's duty of fair representation, the union employee is bound by the union's consent. Bolden, 953 F.2d at 828.

As the Union consented to random drug testing in Article XXI of the CBA, Krieg is bound by that consent and neither he nor the Union may raise constitutional challenges to the language in the City of Marion's drug testing policy. The Dykes Court underscored the importance accorded the terms of the collective bargaining agreement by holding:

16

> Even where a drug testing policy has been held to be
> constitutionally infirm, a public employee may not pursue a civil
> rights suit based upon that infirmity where his union and his
> employer agree to operate that policy. 68 F.3d at 1570.

In <u>Bolden</u>, the Court emphasized the rationale for preventing an individual employee

from raising a constitutional claim on an issue that is the subject of a CBA:

> Through collective bargaining, a public employer and union can
> reach agreement on detailed factual questions … that may have
> important implications under the Fourth Amendment. If individual
> public employees may litigate such questions <u>despite the resolution</u>
> <u>reached through collective bargaining, the utility of collective</u>
> <u>bargaining with respect to drug testing in the public sector would</u>
> <u>be greatly diminished.</u> In sum, we conclude that a public employee
> union acting as exclusive bargaining agent may consent to drug
> testing on behalf of the employees it represents….. [I]ndividual
> employees are bound by such express consent. 963 F.2d at 828
> (Emphasis added)

In the present case, it is clear that the Union consented to random drug testing of all

Street and Sanitation Department employees in Article XXI of the 2003-2004 CBA.

Accordingly, no Fourth Amendment challenges may be raised.

Even assuming that Krieg and the Union have not bargained away their constitutional

claims with respect to drug testing, the defendants assert that as Krieg admittedly operated

vehicles and heavy equipment which might cause injury to the public or co-workers if operated

while under the influence of drugs, Krieg was a safety-sensitive employee and random drug

testing was not violative of his Fourth Amendment rights.

As a general rule, a search, which would include drug testing, must be based upon

individualized suspicion or wrongdoing for the search to be considered reasonable. <u>Chandler v.</u>

<u>Miller</u>, 520 U.S. 305, 313, 117 S.Ct. 1295, 1301, 137 L.Ed.2d 513 (1997). Nevertheless, the

Supreme Court has upheld drug testing even absent reasonable suspicion of drug use or

impairment when such testing serves "special needs, beyond the normal need of law enforcement." Skinner v. Railway Labor Executives Association, 489 U.S. 602, 619, 119 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989).

"There is no general Fourth Amendment prohibition against suspicionless and random drug testing." Crager v. Board of Education of Knott County, Kentucky, 313 F.Supp.2d 690, 693 (E.D.Ky. 2004). The Fourth Amendment permits random drug testing of government employees engaged in safety-sensitive functions. National Treasury Employees Union v. Von Raab, 49 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Safety sensitive positions are those positions that involve "discharge of duties fraught with risks of injury to others that even a momentary lapse of attention could have disastrous consequences." Skinner, supra, 489 U.S. at 628, 119 S.Ct. at 1419. The Skinner Court also noted that the employees subject to random drug testing could cause great human loss and harm before any signs of impairment may become noticeable to supervisors or others, as such employees will seldom display any outward signs detectable by lay persons, or, in many cases, even physicians. Id.

Numerous courts have upheld suspicionless random drug testing in a variety of circumstances. For example, in Von Raab, the Supreme Court recognized a legitimate interest in testing for off-duty drug use by United States Customs Service employees interested in transfer or promotion to positions involving exceptional duties including drug interdiction and the use of firearms. 489 U.S. at 668-72, 109 S.Ct. at 1392-94. In Skinner, the Supreme Court held that random drug testing of railroad workers in safety sensitive positions does not violate the Fourth Amendment despite the lack of a triggering event like an accident or safety rule violation. In International Brotherhood of Teamsters v. Department of Transportation, 932 F.2d 1292, 1306

18

(9th Cir. 1991), the Court found a "compelling interest," in preventing drivers of commercial vehicles from using illegal drugs while operating vehicles as justification for random drug testing under the Fourth Amendment. In <u>American Fed'n of Gov. Employees v. Skinner</u>, 885 F.2d 884, 892 (D.C.Cir. 1989), the Court upheld random drug testing of Department of Transportation motor vehicle operators who drive passenger-laden shuttle buses in light of "obvious safety interests." In <u>Transport Workers' Union of Phil. Local 234 v. Southeastern Pa. Transp Auth.</u>, 884 F.2d 709, 712 (3rd Cir. 1989), the Court upheld a public transportation authority's random drug and alcohol urinalysis of employees despite the lack of a basis in "individualized suspicion." In <u>Keaveney v. Town of Brookline</u>, 937 F.Supp. 975, 986-87 (D.Mass. 1996), the Court held that random drug testing of employees who drove commercial vehicles such as dump trucks, cranes and tractors was permissible even though the employees did not regularly transport passengers in the vehicles because the employees did operate "large vehicles that could be deadly in the hands of an employee lacking judgment because of drug or alcohol intake."

The defendants argue  that the lack of a CDL is not determinative of whether Krieg performed job functions which could be considered safety sensitive. After all, Krieg himself admits that he could injure himself, co-workers, and the general public if he operated vehicles and equipment under the influence of drugs or alcohol. The Union President, Johnson, agrees. Superintendent Antrobus opines that all of his employees are safety sensitive employees because they regularly operate large vehicles and heavy equipment in areas open to the public and co-workers.

The facts here are similar to those in the case of <u>Middlebrooks v. Wayne County</u>, 521

N.W.2d 774 (Mich. 1994). Middlebrooks applied for a permanent position as a general service

worker. The position required him to operate saws, wood chippers, and a front-end loader on

Wayne County Road Commission premises. He was also required to operate a riding lawn

mower on highway medians and embankments and drive trucks, including dump trucks carrying

equipment from work sites to repair facilities used by the Commission. Middlebrooks submitted

to a preemployment physical which included urinalysis testing for controlled substances. The

test was positive for opiates and cocaine, which disqualified him from employment.

Middlebrooks filed suit alleging that the drug test violated his Fourth Amendment rights. The

Trial Court granted summary judgment for the defendants on the grounds that drug testing is

permitted under the Fourth Amendment, where the position involves the operation of heavy

machinery. 521 N.W.2d at 776. However, the Michigan Court of Appeals reversed.

In reinstating summary judgment for the defendants, the Michigan Supreme Court first

surveyed Supreme Court and other precedent on random drug testing for employees who operate

vehicles and machinery in the general public. The Court held that although the general service

worker position for which Middlebrooks applied did not involve duties as a commercial driver,

his job responsibilities would involve tasks which might cause injury to the general public,

thereby justifying random drug testing:

> Operation of a riding lawn mower, especially on highway medians
> and embankments, and driving front-end loaders, trucks, and other
> equipment between a work site and repair facility, might result in
> serious injury from "momentary lapse[s] of attention"
> characteristic of illegal drug use. Middlebrooks had a reduced
> expectation of privacy in not being subjected to urinalysis drug
> screening by the government as a result of his application for a
> position with a governmental agency as a laborer, in which
> potentially serious accidents might result from collisions between a
> mower, being operated on a median or embankment, and vehicles

20

on the highway, often traveling at high rates of speed. <u>A riding
lawn mower, front-end loader, or truck might become "lethal"
when "operated negligently." Thus, we conclude that the balance
mandated by the Fourth Amendment tips in favor of permitting the
state to require urinalysis testing of Middlebrooks although the
general service-worker position that he sought is not "regulated
pervasively" like that of a railroad employee, or commercial
driver.</u>

* * * * *

<u>The operation of lawn mowers and other mechanical equipment on
or near roads designed primarily for cars, vans, and trucks poses a
greater threat to traffic safety than the operation of ordinary
automobiles, vans, and trucks.</u>

521 N.W.2d at 780 (Emphasis added) .

In <u>Plane v. United States</u>, 796 F.Supp. 1070 (W.D.Mich. 1992). The AFL-CIO sought to

have mandatory random urinalysis drug testing declared unconstitutional as applied to heavy

equipment operators. On cross-motions for summary judgment, the District Court held that

heavy equipment operators, which included employees who operated fork-lifts, tractors and

cranes, could be subject to random drug testing because there was a potential for them to be a

danger to the health and safety of other employees as well as the general public. The Court

rejected the AFL-CIO's argument that random drug testing was constitutionally impermissible

because the employees did not transport passengers as part of their duties and had little contact

with the general public. The Court held that although the heavy equipment did not carry

passengers, "it is obvious that the safety and health of people can be significantly endangered by

employees operating equipment that do not carry passengers." 796 F.Supp. at 1076. Citing to

<u>Skinner</u>, the Court concluded that the government "has a compelling interest in detecting and

deterring drug use by employees operating such equipment." <u>Id</u>. As operating heavy equipment

created a "great risk of harm to other persons in the area if the operator is impaired due to drug use," the dangers involved justified random drug testing, even if the safety of the general public is not involved. Id. at 1077.

The plaintiffs agree that random suspicionless drug testing is constitutionally permissible if "special needs" exist to justify the testing. Skinner v. Railway Labor Executives Association, 49 U.S. 602, 619, 119 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989). Similarly, the plaintiffs do not contest the general proposition that suspicionless drug testing of employees who occupy safety sensitive positions fall within the special needs exception carved from the Fourth Amendment by the Supreme Court. There is no suggestion by the plaintiffs that members of the Street and Sanitation Department who hold CDLs cannot be subjected to random suspicionless drug testing. Indeed, the Federal Motor Carriers Safety Act mandates random drug testing of all individuals who possess CDLs and operate commercial vehicles in the course of interstate commerce. Despite these concessions, Krieg and the Union argue that Krieg and other employees who do not hold CDLs do not fall within the special needs category and, as a result, any drug testing of these employees must be based upon individualized suspicion.  Clearly, however, the fact that Krieg lacked a CDL does not render his position any less safety sensitive. Safety sensitive positions are those positions that involve "discharge of duties fraught with risks of injury to others that even a momentary lapse of attention could have disastrous consequences." Skinner, 489 U.S. at 628, 119 S.Ct. at 1419. Krieg admittedly operated a dump truck with a plow, a riding lawn mower, a front end loader, and a backhoe.  The proper focus is upon the specific type of danger and potential damage posed by Krieg's use of vehicles and equipment, not upon the size or weight of the vehicle or equipment being operated. The special need of governmental entities

22

in the public safety context does not suddenly vanish merely because the employee operates somewhat lighter equipment and machinery.  It cannot be seriously contested that Krieg would pose a serious danger to the public were he to operate any of these pieces of equipment while under the influence of drugs.

There are five factors this Court must balance when evaluating special needs drug testing: (1) the nature of the privacy interest upon which the search intrudes; (2) the character of the intrusion on the individual's privacy interest; (3) the nature of the governmental concern at issue; (4) the immediacy of the government's concern; and (5) the efficacy of the particular means in addressing the problem. Joy v. Penn-Harris-Madison School Corp., 212 F.3d 1052, 1059 (7th Cir. 2000); Vernonia School District v. Acton, 515 U.S. 646, 654-661, 115 S.Ct. 2386, 2391-2395, 132 L.Ed.2d 564 (1995). If the government's interest in random drug testing outweighs the individual's privacy interest, the testing withstands constitutional muster.

With respect to the first factor, all employees of the Street and Sanitation Department, regardless of whether they did or did not possess CDLs, already had a diminished expectation of privacy because random drug testing was one of the bargained-for provisions in the 2003-2004 CBA. Without question, all employees who possess CDLs have a diminished expectation of privacy because they are required by federal law to submit to drug testing in order to maintain their CDLs. With respect to non-CDL employees like Krieg, reasonable privacy expectations are also diminished because Krieg and other non-CDL employees underwent drug testing in the past, and they were aware of provisions in the 2003-2004 CBA permitting random drug testing.

The plaintiffs argue that non-CDL employees do not have a diminished expectation of privacy because they do not work in a "pervasively regulated industry" or in high risk positions

and were never placed on notice that they were considered safety-sensitive employees. First, the plaintiffs cite no legal authority for the proposition that the City of Marion was obligated to inform each employee that he or she is considered safety sensitive. Second, by operating large vehicles and heavy equipment in areas open to the general public and co-workers, non-CDL employees engage in activities just as potentially dangerous as their CDL brethren.

The plaintiffs attempt to distinguish the case relied upon by the City of Marion, Middlebrooks v. Wayne County, 521 N.W.2d 774 (Mich. 1994), by asserting that the individual in that case had a diminished expectation of privacy because he was applying for a permanent position and was being tested on a one-time basis in conjunction with that application. It is apparently the plaintiffs' contention that Krieg's situation is factually distinguishable because Krieg was already involved in the operation of equipment and heavy machinery whereas Middlebrooks had just applied for a position which would require him to operate heavy equipment and machinery. This is a factual distinction which makes no difference.

The import of the Middlebrooks decision is that, whether in a pre-employment context or an employment context, random drug testing of employees with job responsibilities involving tasks which might cause injury to the general public, such as the operation of heavy equipment and machinery, presents sufficient safety risks so as to justify random drug testing. Both Middlebrooks and the other case relied upon by the City of Marion, Plane v. United States, 796 F.Supp. 1070 (W.D.Mich. 1992), which the plaintiffs do not address, stand for the proposition that where there is a risk of serious harm to the public if Krieg, or any other street and sanitation department employee operates heavy vehicles, equipment or machinery while under the influence of alcohol, random drug testing is constitutionally permissible.

24

The second factor, the character of the intrusion, is not at issue in this case. The 2003-2004 CBA sets forth specific testing procedures to be used whenever Street and Sanitation Department employees were subjected to drug testing. In addition, the Personnel Policy Manual sets forth specific testing procedures.

As to the third, fourth and fifth factors, the City of Marion certainly has a strong interest in the health and safety risks presented to pedestrians and motorists who might  encounter vehicles or machinery operated by street and sanitation department employees, whether the particular employee does or does not maintain a CDL. In response, the plaintiffs argue that as non-CDL employees are not safety sensitive, and therefore not subject to regulation under the Federal Motor Carriers Safety Act, generalized health and safety concerns do not satisfy the special need requirement for suspicionless drug testing. However, the plaintiffs argument neglects the Supreme Court's admonition that it is unnecessary for the government to point to a particular prior drug problem, or a history of drug-related accidents, to articulate a rational basis for suspicionless drug testing. The Supreme Court "has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing." Board of Education of Independent School District No. 92 v. Earls, 536 U.S. 822, 835, 122 S.Ct. 2559, 2562-63, 153 L.Ed.2d 735 (2002). Similarly, in National Treasury Employee's Union v. Von Raab, 489 U.S. 656, 673-74, 675, 109 S.Ct. 1384, 1395, 103 L.Ed.2d 685 (1989), the Supreme Court held that the compelling interest in protecting the public from harm by impaired employees outweighed the intrusion into the employee's privacy, even if no drug abuse problem had prompted the testing program.

In Knox County Education Association v. Knox County Board of Education, 158 F.3d

361 (6th Cir. 1998), cert. denied, 528 U.S. 812, 120 S.Ct. 46, 145 L.Ed.2d 41 (1999), the Sixth

Circuit upheld a drug testing policy that provided for the suspicionless testing of teachers,

finding that teachers and school administrators occupied safety sensitive positions. In so holding,

the Court rejected the plaintiff's argument that the School District must first demonstrate a drug

problem to justify a suspicionless testing regime:

> In this case, there is little, if any, evidence of a pronounced drug or alcohol abuse
> problem among Knox County's teachers or other professional employees.
> Specifically, there is no empirical or historical evidence of an ongoing abuse
> problem (as in Skinner) or evidence of a newly blossoming epidemic of abuse (as
> in Vernonia). In fact, since the Policy was implemented in 1989, only one
> prospective hire has failed the suspicionless drug test.
>
> However, the existence of a pronounced drug problem is not a *sine qua non* for a
> constitutional suspicionless drug testing program. 158 F.3d at 374.

Clearly, the same rationale should apply in this case.  After surveying the current law on the

issue, this court finds that, as in Plane and Middlebrooks, there is a risk of serious harm to the

public if Krieg, or any other Street and Sanitation Department employee, operates vehicles,

heavy equipment and machinery while under the influence of alcohol or drugs.  Clearly, the

work performed by Krieg was safety sensitive work, even if he was never advised that he held a

safety-sensitive position.  As noted in the caselaw discussed above, Krieg's duties are similar to

those in other jobs where Courts have upheld random drug and alcohol testing as being

reasonable and not violative of the Fourth Amendment. Thus, even if Krieg's constitutional

challenge is properly before the Court, the defendants are entitled to summary judgment because

the random drug test was constitutionally permissible.

The defendants next argue that the substance abuse policy is not unconstitutional on its

face.  In Count IV of the Complaint, the plaintiffs allege that "the June 7, 2004 Substance Abuse

26

Policy is unconstitutional on its face because it allows searches and seizures of the urine of Local

3063's members employed in the Street and Sanitation Department without individualized

suspicion." (Complaint, ¶25).  When the constitutionality of a policy is facially challenged, the

Court must determine "whether the test contemplated by the [policy] can ever be conducted."

Skinner v. Railway Labor Executives Association, 489 U.S. 602, 632-33 n.10, 109 S.Ct. 1402,

1421 n.10, 103 L.Ed.2d 639 (1989). In other words, the challenger must "establish that no set of

circumstances exists under which the [policy] would be valid."  United States v. Salerno, 481

U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

For the reasons noted above, it is highly likely that at least some Street and Sanitation

Department employees may properly be required to submit random drug tests. It is undisputed

that a majority of the employees of the Street and Sanitation Department maintain CDL licenses.

The Union cannot show that there are no circumstances under which one of its members may be

subjected to a random drug test. In fact, case law compels otherwise. As indicated, it is well-

established that individuals in safety sensitive positions, which would include employees holding

CDLs, may be constitutionally required to submit to random drug testing. Thus, the Substance

Abuse Policy is facially valid and summary judgment will be granted in favor of the defendants

on this issue.

The court will now turn to Krieg's due process claim.  In Count I of the Complaint, Krieg

alleges that the defendants denied him due process of law by "discharging plaintiff without

affording him the pre-termination hearing required by the due process clause of the Fourteenth

Amendment." (Complaint, ¶18). While Krieg claims in paragraph 3 of the Complaint that the

CBA "permitted his employment to be terminated only in the event he was discharged for just

cause," a review of the 2003-2004 CBA reveals that it contains no express provision as to just

cause termination[2]. Krieg was an at will employee and therefore has no protected property

interest in continued employment. <u>Moulton v. Vigo County</u>, 150 F.3d 801, 805 (7th Cir. 1998);

<u>Phegley v. Indiana Dept. of Highways</u>, 564 N.E.2d 291, 295 (Ind.Ct.App. 1990).

Even if the 2003-2004 CBA somehow gives Krieg a property interest in his employment,

defendants submit that Krieg cannot pursue a due process claim under §1983 because it is

undisputed that Krieg failed to avail himself of the final step of the grievance procedure in

Article V of the 2003-2004 CBA: arbitration. Article V states that "[i]f either side is dissatisfied

with the decision of the Board of Works, a request to go to Step 4 (arbitration) **shall** be made

within fifteen (15) work days." (Emphasis added). Krieg availed himself of the first three steps

of the grievance procedure, the third step (although he did not personally attend) being the

hearing before the Board of Public Works. Dissatisfied with the Board of Public Works' decision

to terminate his employment for refusing to take the drug test, Krieg's final step under the 2003-

2004 CBA was mandatory arbitration, a step Krieg admits he did not take.

Krieg's failure to proceed to arbitration as provided for in the 2003-2004 CBA precludes

his due process claim. Courts have held that where a due process claim is raised against a public

employer and there is a grievance and/or arbitration procedure in place, the failure to exhaust

those remedies bars a due process challenge. <u>See e.g.</u>, <u>Narumanchi v. Bd. Of Trustees of Conn.

State Univ.</u>, 850 F.2d 70, 72 (2nd Cir. 1988)(affirming dismissal of a tenured teacher's procedural

due process claim because the teacher failed to submit to his union's grievance procedures, as set

---

[2]  Krieg relies on Article IX, Sect 6, ¶ B.5 which states that "The seniority of an
employee shall terminate . . . [w]hen he/she is discharged for just cause."  However, that section
governs seniority and does not specifically govern terminations.

forth in a collective bargaining agreement, after he was suspended without pay); <u>Aronson v. Hall</u>, 707 F.2d 693, 694 (2nd Cir. 1983)(per curiam) (affirming a district court's dismissal of a plaintiff's procedural due process claim because "[h]aving chosen not to pursue available administrative review, [plaintiff] is hardly in a position to claim that such review denied him due process"); <u>Keim v. County of Bucks</u>, 322 F.Supp.2d 587, 590-91 (E.D. Pa. 2004) (failure of county corrections officer to go through last of four steps in collective bargaining agreement's grievance/arbitration procedure when appealing a reprimand precluded his procedural due process claim).

Finally, even if Krieg had a property right in his employment and was not required to submit to arbitration, the evidence in this case plainly demonstrates that due process was satisfied. Due process requires that before a governmental entity may deprive a person of a constitutionally protected property interest, it must conduct some type of hearing accompanied by notice and an opportunity to be heard. <u>Zinermon v. Burch</u>, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). Before a person may be deprived of a constitutionally protected property interest in public employment, due process requires that a pre-termination hearing be held. <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The pre-termination hearing need not be elaborate. The essential requirements are merely notice and an opportunity to respond, orally or in writing. <u>Loudermill</u>, 470 U.S. at 545, 105 S.Ct. at 1497.

Here, it is undisputed that Krieg was afforded the essential requirements of due process. He was given ample notice that the Board of Public Works would be considering the termination of his employment. Krieg was provided with an opportunity to present his side of the story at the

Board of Public Works' meeting. However, he chose not to avail himself of this opportunity. This does not create a defect in the due process offered to him. Krieg chose not to attend the hearing and therefore waived his right to raise a due process claim.  The Seventh Circuit Court of Appeals has repeatedly held that an employee waives the right to a pre-termination hearing when an employer offers a hearing and the employees fails to accept. See e.g., Flynn v. Sandahl, 58 F.3d 283, 288 (7th Cir. 1995) ("Employee cannot claim lack of due process when his employer offered him such a pre-termination hearing and he refused to attend."); Cliff v. Board of School Commissioners of the City of Indianapolis, Indiana, 42 F.3d 403, 413-14 (7th Cir. 1994) (finding that employee waived right to a pre-termination hearing by failing to accept an earlier offer for such a hearing); Fern v. Thorp Public School, 532 F.2d 1120, 1131-32 (7th Cir. 1976) (holding school teacher to be terminated for cause waived his claim of procedural due process violation when he knew the time, place and purpose of the pre-termination hearing before the school board but chose not to attend after conferring with his counsel). Simply put, one "cannot sue in federal court to secure a right which he declined when it was voluntarily offered to him." Suckle v. Madison General Hospital, 499 F.2d 1364, 1367 (7th Cir. 1974).   Consequently, summary judgment will be granted in favor of the defendants on the due process claim.

Finally, the court will address Krieg's state law defamation claim.  In his complaint, Krieg alleges:

> 10.  On or about October 21, 2004, while he was in Antrobus's office on Union business to discuss issues pertaining to a grievance filed by a fellow bargaining unit employee, Antrobus looked at Plaintiff Krieg and told him that he would now be able to pass a drug test because "they got your stash".  While making that comment Antrobus pointed to a picture in the daily newspaper depicting a large quantity of marijuana that had been seized by Marion law enforcement officials the previous day.  This comment

30

was made in the presence of officials of Local 3063. . . .

\*   \*   \*

29.  Defendant Antrobus defamed Plaintiff Krieg by
imputing to him criminal activity, i.e., illegal use or possession of
marijuana, in front of his fellow employees and union
representatives, which damaged his reputation and caused him
severe emotional distress, in violation of Indiana common law.

The defendants seek summary judgment on this claim, and the plaintiffs have totally

failed to brief the issue.   The law is clear that, since the court is granting the defendants' motion

for summary judgment on all federal claims, it may decline to exercise supplemental jurisdiction

over Krieg's state law defamation claim.  28 U.S.C. § 1367(c)(3).  When all federal claims "drop

out" prior to trial, the District Court should not retain a state law claim absent "extraordinary

circumstances."  <u>Wentska v.  Gellman</u>, 991 F.2d 423, 425 (7th Cir.  1993).  Clearly, no such

extraordinary circumstances exist in this case.  Thus, the court declines jurisdiction over the

defamation claim and the claim will be dismissed.

<u>Conclusion</u>

For the following reasons, the plaintiffs' motion for partial summary judgment is hereby

DENIED, and the defendants' motion for summary judgment is hereby GRANTED as to all

federal claims.  Further, the plaintiffs' state law defamation claim is hereby DISMISSED

WITHOUT PREJUDICE.

 Entered: April 3, 2006.

<u>s/ William C.  Lee    </u>
William C. Lee, Judge
United States District Court

31